[Civil No. 2666. Filed January 9, 1928.]

[262 Pac. 995.]

MARGARET HILTON STRAHAN, Appellant, v. C. HAYNES, Appellee.

Mr. T. E. Allyn and Mr. Sam H. Kyle (Mr. L. B. Whitney, of Counsel), for Appellant.

Mr. E. W. McFarland and Mr. L. J. Cox, for Appellee.

LOCKWOOD, J.—C. Haynes, hereinafter called plaintiff, brought suit against Margaret Hilton Strahan, hereinafter called defendant, for specific performance of an alleged contract for the purchase and sale of real estate. There were several other parties named as defendants in the complaint, but, since they defaulted, and have taken no appeal from the judgment rendered herein, it is not necessary that we consider them for the purposes of this opinion.

The complaint sets up, in substance, as follows: On and prior to the nineteenth day of June, 1923, defendant was the owner and in possession of certain real estate situated in Phoenix, Arizona, and on said date entered into an agreement with William C. Fields for the purchase and sale of said real estate for the price of $8,500, payable $500 in cash at the execution of the agreement, $3,500 upon the delivery of a warranty deed to the property, and $4,500 by the assumption of a first mortgage then existing on the premises. The $500 was paid at the execution of the agreement, and on the twentieth day of June a tender was made of the $3,500, and an offer to assume and pay the mortgage, but defendant refused to accept the money or to convey the property to Fields or to anyone for him, or to give him possession. About the twenty-fifth day of July plaintiff herein purchased from Fields the latter's rights in the agreement of purchase of the said property, paying thereon the sum of $500, and tendering to defendant the $3,500, and offering to assume the mortgage, but defendant still refused to convey or surrender possession. It was further set up that the premises were rented for $150 per month, and that defendant had collected the rent thereon continuously since the date of the agreement of sale, without accounting to plaintiff therefor. An allegation was also made of a continuous tender, and there was a prayer for specific performance and an accounting by defendant for the rents which it was alleged she had received.

Defendant answered by various admissions and denials, and also through a cross-complaint. The effect of her pleadings was to raise four issues: First, a denial of the execution of the agreement of purchase and sale; second, that, if she had executed it, she was at the time incompetent and mentally irresponsible; third, that there had been no payment or

tender under the agreement; and, fourth, that the property in question was her homestead, and as such a contract for specific performance of a sale thereof could not be enforced. The case was heard before a jury, and two interrogatories were submitted, one on the question of whether defendant had executed the agreement, and the other on whether she was mentally competent at the time it was alleged she executed it. Both of these questions were answered in the affirmative by the jury. It had been stipulated during the trial that the matter of an accounting for the rents should be determined by the court without the aid of the jury in case that issue became material, and evidence was presented to the court upon that point. After various motions were made and passed on, the court filed its findings of fact and conclusions of law, and thereupon rendered a decree vesting the title to the property in plaintiff, subject to a first mortgage in the sum of $4,500, which he was to assume, crediting on the cash payments of $4,000 set up in the agreement of sale the $500 initial payment and the further sum of $2,300.97, which the court found, after due hearing, was the net amount plaintiff had been damaged by the withholding of possession of the premises, and finding there was still due on the purchase price $1,199.03. After various supplementary motions and the usual motion for new trial by defendant had been made and overruled, an appeal was taken to this court.

There are some twenty assignments of error which we will consider in their order so far as we think necessary for the determination of this case. The first is that defendant's general demurrer should have been sustained. The only question raised under this assignment is that the complaint sets out a clear case of champerty and maintenance. This doctrine has been practically discarded both in England, the country of its origin, and in the United States.

There may be a very few states in which it is still in force, but we think Arizona is not one of them. The subject is thoroughly discussed in the case of *Gurule* v. *Duran,* 20 N. M. 348, L. R. A. 1915F 648, 149 Pac. 302. We heartily agree with the principles laid down therein, and do not hesitate to hold that the complaint in this case is not subject to demurrer on the ground that it sets up a case of champerty and maintenance.

The second assignment is that the court should not have allowed the introduction of Plaintiff's Exhibit "C," it being an alleged listing of the property for sale with the real estate firm of Murphy & Fields, and signed by the defendant under the name of Mrs. R. B. Hilton. The only objection made to the admission of this document was that it was not properly "identified." The reporter's transcript shows that a proper identification was made, and we think the court did not err in overruling an objection made on this ground. It is a well-established rule of evidence that, when objection is made to the introduction of a document on a specific ground which is not well taken, it is not error for the court to admit the document, even though there are other grounds which would have caused it to be excluded, had they been urged. 26 R. C. L. 1048. Waiving this point, however, we are satisfied that the document was admissible, first, as showing the authority of Murphy and Fields as the agents of defendant to receive the initial payment on a sale, and, second, as bearing on the issue as to whether or not she had actually executed the subsequent agreement of sale.

The third assignment is that the court should have granted defendant's motion for judgment on the ground of variance between the proof and the complaint. This is based apparently upon the claim that there is no evidence the initial payment of $500

was ever made to defendant, and that there was never a legal tender of the balance of the purchase price. The agreement of sale on this point reads as follows:

"The sum of five hundred ($500.00) dollars upon the signing of this agreement (said sum now in the hands of my agent, J. T. Murphy), the sum of three thousand five hundred ($3,500.00) dollars upon delivery of warranty deed to said property."

This agreement was signed by defendant and Fields, and taken in connection with the listing of the property and the oral testimony, we think was sufficient to support the finding made by the court that Murphy was the agent of defendant for the purpose of receiving the initial payment, and that he did receive it. There is also sufficient evidence of a legal tender of the balance of the $3,500. If such was the case, the denial of the motion for judgment in favor of defendant on the ground of variance was proper.

The fourth assignment of error raises the most serious question in the case. Defendant set up in her answer that the property in question was her homestead, claimed by her as such under chapter 1, title 20, Revised Statutes of Arizona 1913, Civil Code. To sustain this allegation, she offered to produce certain homestead records from the office of the county recorder of Maricopa county in order to prove that the property in question was claimed as a homestead by her. To this, objection was made by plaintiff on the ground that such evidence would be immaterial. In the course of a colloquy between defendant's counsel and the court, the former stated very clearly that this record was offered on the theory that no decree of specific performance could be enforced against a homestead, and, on the court's statement that objection would be sustained, if made for that purpose, counsel said:

"Let the record show it was tendered and objected to. Let the record show that the homestead record

of Margaret Strahan to this property was offered as evidence, objected to, and sustained.''

The record on appeal to this court does not contain anything which would inform us as to whether or not there actually was in existence a declaration of homestead covering the property in question, or, in case there was such a document, of its contents and date of execution and filing. It is the ordinary rule that, when a document is offered in evidence, and rejected by the trial court, the record must preserve the evidence, either literally or in substance, before error can be predicated on its rejection. *Copper Belle Min. Co.* v. *Costello,* 11 Ariz. 334, 95 Pac. 94; *Edwards* v. *Simms,* 8 Ariz. 261, 71 Pac. 902; 4 C. J. 73.

Defendant claims, however, that, while this is admittedly the general rule, yet in this case, in view of the special defense set up in her answer, which reads as follows: ''And for a further special defense, defendant alleges and states the facts to be that said alleged and described property is the homestead of this defendant, properly claimed as such under chapter I of title 20, Homesteads and Exemptions, 1913, Civil Code of Arizona,'' if it clearly appears from the record in this court that the evidence rejected would have been material in the support of such defense, it is not necessary that the excluded evidence be contained in full in the record sent up. Assuming for the purpose of the argument that the rule contended for by defendant is correct, the question then is, Would evidence of any declaration of homestead on the property in question by defendant, no matter when recorded, necessarily be a defense to an action for specific performance of a contract of sale executed by her?

Homesteads are purely the creation of statute, and, in determining the law applying to them, the particular statute of each state must be consulted.

The sections of our homestead law pertinent to the question before the court, found in the 1913 Civil Code, Revised Statutes of Arizona, read as follows:

"3288. Every person who is the head of a family, and whose family resides within this state, may hold as a homestead, exempt from attachment, execution and *forced sale,* real property to be selected by him or her, which homestead shall be in one compact body, not to exceed in value the sum of four thousand dollars, and shall consist of the dwelling house in which the claimant resides and the land on which the same is situated or of land that the claimant shall designate, provided the same is in one compact body." (Italics ours.)

"3292. The homestead shall, from the date of the recording of the claim of homestead, be exempt from attachment, execution and *forced sale,* and from *sale* under any judgment or lien existing prior to the recording of such claim, except a mortgage executed by the husband and wife, if the homestead claimant be married, or by the claimant if unmarried. No such *sale* made after the recording of the claim of homestead shall be valid or convey any interest in such homestead, whether made under a judgment existing before or after the recording of such claim." (Italics ours.)

"3293. A homestead can be abandoned only by a declaration of abandonment or waiver, or by a grant thereof, or by permanent removal from the state. Such declaration of abandonment, waiver or grant must be executed:

"First, by the husband and wife, if the claimant be married.

"Second, by the claimant alone, if unmarried.

"A declaration of abandonment shall be effectual only from the time of filing the same for record in the office in which the homestead claim was filed."

It is plain from the language of the statute that a declaration of homestead duly recorded exempts the property from "forced sale," except under certain conditions not involved in this case. The question for our consideration is whether a decree of specific

performance of a contract of the nature of the one sued on is a "forced sale." The contract is in the following language:

"This agreement, made and entered into this 19th day of June, 1925, between Margaret Hilton Strahan, owner of property described herein as her separate estate, party of the first part, and William C. Fields, unmarried, party of the second part, witnesseth:

"That Margaret Hilton Strahan, the said first party, in consideration of the covenants and agreements on the part of the said second party, hereinafter contained, agrees to sell and convey unto the said party of the second part, and said second party agrees to buy, all that certain lot, piece, or parcel of land situated in Maricopa county, state of Arizona, bounded and described as follows, to wit:

"Lot seven (7) block thirty-two (32), original townsite, city of Phoenix, Arizona, being also known as Alexander Hotel, together with all furniture contained in said building, except furniture owned by the tenant, for the sum of eight thousand five hundred ($8,500.00) dollars, lawful money of the United States; and the said second party, in consideration of the premises, agrees to pay to the said party of the first part the said sum of eight thousand five hundred ($8,500.00) dollars in lawful money of the United States as follows, to wit: The sum of five hundred ($500.00) dollars upon the signing of this agreement (said sum now in the hands of my agent, J. T. Murphy); the sum of three thousand five hundred ($3,500.00) dollars upon delivery of warranty deed to said property. And the assumption by second party of mortgage now existing against said property in the principal sum of four thousand five hundred dollars. Taxes, interest, and rents for 1925 to be prorated to date.

"In the event of the failure to comply with the terms hereof, by the said second party, the said first party shall be released from all obligation in law or equity to convey said property, and said second party shall forfeit all rights thereto, including a forfeiture of all payments made by him on this contract at the time of forfeiture, and such payments shall

be retained by said first party in full satisfaction and in liquidation of all damages by her sustained.

"And the said party of the first part, on receiving such payment at the time and in the manner above mentioned, agrees to execute and deliver to the said party of the second part, or to his assigns, a good and sufficient deed, with abstract showing perfect title to said premises.

"And it is understood that time is the essence of this contract and that the stipulations aforesaid are to apply to and bind the heirs, executors, administrators, and assigns of the respective parties.

"In witness whereof the said parties to these presents have hereunto set their hands the day and year first above written.

> "MARGARET HILTON STRAHAN.
> "WILLIAM C. FIELDS."

Upon examining the provisions of this contract, it will be seen that it is not a mere option of purchase, but a definite agreement to convey upon certain terms, and an equally definite agreement to buy upon those terms, and that either party could have compelled specific performance thereof so far as the contract itself is concerned. Specific performance is, of course, an equitable remedy, and is governed by general equitable principles. While in law a contract for the sale of land is in every particular executory, and produces no effect upon the respective estates and titles of the parties, until by the execution and delivery of a deed of conveyance the estate in the land passes to the vendee, equity views the situation from a very different standpoint. Though in some respects and for some purposes the contract is executory in equity as well as at law, so far as the interest or estate in the land of the two parties is concerned, it is regarded as executed and as operating to transfer the estate from the vendor and to vest it in the vendee. One of the great foundation stones of equity is the maxim, "Equity regards and treats as done what in good conscience ought to be

done." Applying this principle to the doctrine of specific performance, by the terms of a contract for sale the land ought to be conveyed to the vendee, and the purchase money ought to be transferred to the vendor. Equity regards it, therefore, as done; the vendee as having acquired the property in the land, and the vendor as having acquired the property in the price. The vendee is looked upon and treated as the owner of the land, and, although the vendor remains owner of the legal estate, he holds it as a naked trustee for the vendee, to whom all the beneficial interest has passed. Pomeroy, Specific Performance of Contracts (3d ed.), par. 314.

Such being the case, a judgment decreeing specific performance is not even a "sale," let alone a "forced sale." The "sale" was made at the time the agreement to sell was executed. The court merely enforces the transfer of the legal title for the purpose of giving notice to third parties as to what the actual rights of the parties are. As between the latter, the equitable title has already passed. The admissibility and effect of the alleged declaration of homestead depends, therefore, upon the date of its recording. If it was recorded before the execution of the contract of sale, the disposition of the property would be governed by the provisions of paragraph 3293, *supra*, and the contract to convey would be unenforceable, whether the homestead was chosen from the community estate or from separate property. If, on the other hand, the declaration of homestead was made after the execution of the agreement to convey, it would be of no effect so far as such agreement was concerned, for, as we have pointed out, in the eyes of equity, the "sale" had actually been made before the declaration. Since there is nothing in the record to show whether or not the declaration of homestead was recorded before or after the execution of the agreement for sale, we

cannot say the trial court erred in its rejection thereof.

We have examined carefully all the cases cited by defendant in her brief, and find nothing therein in conflict with the foregoing rule. These cases may be divided into three classes. In the first are the Texas decisions: *Jones* v. *Goff*, 63 Tex. 248; *Staten* v. *Harris* (Tex. Civ. App.), 239 S. W. 334; *Collett* v. *Harris* (Tex. Civ. App.), 229 S. W. 885; *Maynard* v. *Gilliam* (Tex. Civ. App.), 225 S. W. 818.

In that state the statute expressly gives the right to the wife to retract any agreement to convey the homestead up to the very time of the execution of the deed, and the leading case of *Jones* v. *Goff*, *supra*, as well as the others cited, was based upon that right. No such provision appears in our statute. The second class is represented by *Mundy* v. *Shellaberger* (C. C. A.), 161 Fed. 503; *Laubscher* v. *Mixell*, 171 Iowa 88, 153 N. W. 335; *Ferrell* v. *Wood*, 149 Ark. 376, 16 A. L. R. 1033, 232 S. W. 577; *Droppers* v. *Marshall*, 203 Mich. 173, 4 A. L. R. 1266, 168 N. W. 1001.

In every one of these, as well as in the Texas cases just cited, the declaration of homestead was made *before* the execution of the contract of sale. There is no doubt in our minds that under such circumstances, in view of our statute, it would require the consent of both spouses to a grant of the homestead. The third class is such as *Frarey* v. *Wheeler*, 4 Cr. 190; *Lane* v. *McKeen*, 15 Me. 304; *Pilcher* v. *Smith*, 2 Head (Tenn.) 208; *Blythe* v. *Dargin*, 68 Ala. 370. In these cases it is held generally that specific performance of the contract of a married woman to convey her separate property will not be enforced. They, however, are all avowedly based on the doctrine repudiated by us so distinctly in the case of *Hall* v. *Weatherford*, 32 Ariz. 370, 259 Pac. 282, wherein we state:

"From the case of *Charauleau* v. *Woffenden,* 1 Ariz. 243, 25 Pac. 652, to that of *Schofield* v. *Gold,* 26 Ariz. 296, 37 A. L. R. 275, 225 Pac. 71, our attitude has been that the wife was an independent human being, with the full power to decide and determine for herself all questions involving her rights, and the old presumption that though before marriage, and during widowhood, she was as fully capable of managing her affairs as a man under the same circumstances, while coverture existed she lost all independent volition, knowledge, and capacity, and was to be treated as an infant under guardianship, so far as Arizona is concerned, is utterly obsolete. Since such is our theory of the marriage status, cases which are based either consciously or unconsciously on the old idea of the inferiority of the female sex and the subserviency of the wife to the husband are not in point. We hold that when property rights are concerned the same rule of estoppel applies to a woman as to a man; to the wife as to the husband; to a partner in the marriage relation as to a partner in any other relation of life."

So far as we have been able to discover, there is no case where an executory contract of sale which would have been enforceable in the *absence* of a declaration of homestead has been denied enforcement on the ground of a declaration made *after* the contract of sale was executed. We, however, find several instances arising in the state of California where an effort was made to establish the rule that a subsequent declaration of homestead voided an otherwise valid executory contract of sale. In each of these cases the attempt was repudiated by the California Supreme Court. *Gilbert* v. *Sleeper,* 71 Cal. 290, 12 Pac. 172; *Hayford* v. *Kocher,* 65 Cal. 389, 4 Pac. 350; *Smith* v. *Bangham,* 156 Cal. 359, 28 L. R. A. (N. S.) 522, 104 Pac. 689.

In the last-named case it is true three of the justices dissented, but the dissent was based on grounds not involving the principle under discussion. We quote from the majority opinion:

"The fundamental basis upon which all these deci-. sions must rest is the proposition that (except where the contrary is expressly declared by statute), a declaration of homestead is subject to all rights in the property known by the person filing the declaration to exist. And this principle, applied to the facts of the present case, requires the holding that the declaration of homestead made by Mrs. Bangham with knowledge of the contract theretofore entered into with the plaintiff was subject to his right to demand a conveyance of the land in accordance with his contract. . . .

"Here, however, we have no question of an attempt to subject the land to execution or forced sale from which it is specifically exempted. The question is merely whether antecedent rights in the property shall be cut off by a declaration of homestead, or, otherwise stated, whether such declaration shall enlarge the title owned at the time of its filing."

While the hardships of a rule are never an excuse for declaring invalid a statute within the constitutional power of the legislature to enact, yet, when a certain construction of a statute opens the door to fraud and injustice of every description, while a contrary one will accomplish the apparent purpose of the legislature, and avoid such a result, the latter should be followed. It is a well-known fact that a large percentage of the transfers of realty in the state of Arizona is made as a result of executory contracts of sale similar to the one in question. If we hold that the vendor can defeat such a contract at his whim by the subsequent declaration of a homestead, no man would be safe in purchasing property, unless the deed were delivered at the time of purchase. It was urged in the brief of defendant that such danger could be avoided by requiring a waiver of homestead in the contract of sale. It is true that in some cases such a proceeding might be effectual, but not in all. If defendant's contention be true, a single man or woman, who executed a contract of

sale at a time when there was no right of homestead, by a subsequent marriage would give to his spouse the right under the statute to declare a homestead, and render the previous valid contract void. Nor would an attempted waiver of homestead in such a contract be of any value as against the subsequently acquired marital partner. On the other hand, the construction we have adopted will protect every reasonable right of homestead. It was never intended by the legislature, in our opinion, that the homestead law should be a means of defrauding innocent parties, and we think an effort to use a declaration of homestead on a piece of property which the declarant had freely and voluntarily agreed to sell before such declaration, to invalidate such agreement to sell, is on its face an attempted fraud on the purchaser. The true purpose of the homestead law is to protect existing rights against involuntary loss, and not to restore rights already voluntarily parted with.

The fifth assignment is that a witness for plaintiff was allowed to testify in regard to what one Barkley said in reference to certain matters pertaining to the lawsuit, and it is urged that this testimony was inadmissible as being hearsay. The record shows that Barkley's statements were made in the presence of, and almost entirely to, defendant, in the course of a discussion regarding the property. We think such testimony does not come within the hearsay rule.

The sixth assignment is that the first interrogatory submitted to the jury was a question of law, instead of one of fact, and that it assumed the document in question was a valid contract. We think the interrogatory does not bear such construction. It was simply as to whether or not defendant actually signed a certain identified document. This was clearly one of the issues of the case, and made

such by the defendant in her answer, and the court afterwards, in its conclusions of law and judgment, determined the legal effect of the document.

The seventh assignment is that the second interrogatory should have been limited to the influence of narcotics or alcohol as affecting the incompetency of defendant. The answer alleges incompetency without any special cause assigned therefor, and does not limit the defense to incompetency caused by narcotics or alcohol. The interrogatory was therefore proper.

The eighth assignment is that the trial court should have allowed the defendant to make a trial amendment to her answer and cross-complaint by alleging that the property in question was community instead of separate. The original answer and cross-complaint verified by defendant sets up that the property was separate. The motion for amendment is to the effect that the defendant still insists the property to be her separate estate, but that her attorney believes it to be community. It is a novel suggestion to us that an attorney may be allowed to set up a defense which his client repudiates, and we think the trial court did not err in its refusal to allow the amendment under the circumstances.

The ninth, tenth, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth and nineteenth assignments are either waived by failure to argue them, or do not represent questions of sufficient merit to require discussion by this court.

The eleventh assignment, to the effect that there is not sufficient evidence to prove the agency of Murphy, is disposed of by what we have previously stated in regard to the third assignment.

The twentieth assignment of error is to the effect that under the court's instructions the jury was told:

"In other words, an affirmative answer to the first interrogatory must be based upon a preponderance of the evidence on behalf of the plaintiff, and an

*affirmative answer to the second interrogatory must be based on a preponderance of the evidence on behalf of defendant.''*

The second interrogatory reads as follows:

"If you answer the foregoing interrogatory No. 1 in the affirmative, did the defendant, Margaret Hilton Strahan, at the time of executing said contract understand, in a reasonable manner, the nature and effect of its execution and the nature and effect of the terms of the contract? Answer 'Yes' or 'No.' "

Just previous to giving the one complained of, the court had correctly and carefully explained to the jury that, so far as the first interrogatory was concerned, the burden of proof was on the plaintiff to prove the execution of the contract by a preponderance of the evidence, and therefore an affirmative answer would require such preponderance on behalf of the plaintiff. The court then stated, referring to the defense of incompetency:

"Now, that being an affirmative defense which the defendant has set up, if you find that the defendant, Margaret Hilton Strahan executed the contract, the defendant has set this up as an affirmative defense, and the burden of proof is upon the defendant to establish the fact by a preponderance of the evidence. Therefore, in order to find that fact in the affirmative, you must find that the defendant has proved that fact by what we call a preponderance of the evidence."

The words "that fact," used above, plainly referred to the alleged incompetency set up by defendant, and the court properly reiterated that "that fact" must be proved by a preponderance of the evidence on behalf of defendant. So far, no exception could be taken to the instructions, and the jury must have understood them correctly. The court, then, in its desire to make the matter particularly plain, summed up by using the language of which complaint was made. The whole context of the pre-

vious instructions unmistakably shows that the erroneous use of the word "affirmative" in the place of "negative" was a mere inadvertence, and must have been taken by the jury as such. The interrogatory was simple and easily understood by men of ordinary intelligence. We think, in view of its language and the instructions taken as a whole, the jury could not possibly have believed the court meant that, in order to answer the defendant was competent, they must believe that she had proved by a preponderance of the evidence her affirmative defense that she was incompetent.

There being no error of sufficient gravity to require a reversal of the case, the judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.